## NATIONAL LABOR RELATIONS BOARD v. REED & PRINCE MFG. CO.

### No. 3549.

Circuit Court of Appeals, First Circuit.

April 2, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1119, 85 L.Ed. ——.

Ernest A. Gross, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Richard C. Barrett, and Thomas F. Wilson, all of Washington, D. C., on the brief), for the Board.

George H. Mason, of Worcester, Mass. (Jay Clark, Jr., and Vaughan, Esty, Clark & Crotty, all of Worcester, Mass., on the brief), for Reed & Prince Mfg. Co.

Before MAGRUDER and MAHONEY, Circuit Judges, and McLELLAN, District Judge.

MAHONEY, Circuit Judge.

This case is before this court upon petition of the National Labor Relations Board for the enforcement of an Order issued against the respondent pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 453 (1935), 29 U.S. C.A. § 160(c). The jurisdiction of this court is derived from Section 10(e) of the same statute.

The respondent, Reed & Prince Manufacturing Company, is a corporation located in the City of Worcester in the Commonwealth of Massachusetts, which is engaged in the manufacture, sale and distribution of nuts, bolts and screws. In its answer the respondent admitted that it was engaged in interstate commerce. The respondent employs approximately 782 production and maintenance employees. There can be no question but that the respondent is subject to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. National Labor Relations Board v. Bradford Dyeing Association, 1940, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 1940, 111 F.2d 681.

In November, 1937, the Steel Workers Organizing Committee of the C. I. O., hereinafter called the Union, filed a charge and an amended charge with the National Labor Relations Board alleging that the respondent had been guilty of various unfair labor practices including the refusal to bargain collectively with the Union as the

authorized representative of a majority of the production and maintenance employees, had interfered with and discouraged membership in the Union and had discriminated against four employees by refusing to reinstate them because of union activities. The Board issued its complaint and notice of hearing, and the respondent filed an answer admitting that it was engaged in interstate commerce but denying the unfair labor practices alleged. A hearing was held at Worcester, Massachusetts, beginning in December, 1937, before a trial examiner.

■ At the close of the hearing the trial examiner filed an intermediate report in which he found that the respondent had violated Section 8(1), (3) and (5)[1] of the National Labor Relations Act, and recommended entry of an order to remedy these violations. Exceptions were filed to the report and an oral argument held upon it before the Board. On May 15, 1939, the Board issued its decision and order upholding the trial examiner except in the matter of his refusal to allow Mr. Johnson to intervene on behalf of the 547 employees who had signed individual contracts with the respondent. The trial examiner had allowed the intervention on behalf of five employees. As the interests of these five were identical with those of the remaining employees, their rights were fully represented by Mr. Johnson, and the error of the examiner could in no wise be considered sufficient to refuse to enforce the order of the Board if otherwise justified.

The testimony before the trial examiner was voluminous, but there was little dispute except as to the inferences and conclusions that could be drawn therefrom. The respondent admitted that the Union was a labor organization within the meaning of Section 2(5) of the Act, 29 U.S.C.A. § 152 (5), and that the production, maintenance and shipping room employees, excluding the supervisory and clerical employees, constituted an appropriate unit for the purposes of collective bargaining within the meaning of Section 9(b) of the Act, 29 U.S.C.A. § 159(b). The Board made findings in accordance therewith, and on the basis of all the testimony concluded that the Union was the exclusive representative of all the employees within the unit for the purposes of collective bargaining within Section 9(a). The Board found that by refusing on June 5, 1937, and thereafter, to bargain with the Union, the respondent had engaged in unfair labor practices within the meaning of Section 8(5). The Board further found that the respondent had engaged in unfair labor practices by interfering with, restraining and coercing its employees in the exercise of rights guaranteed to them in Section 7, 29 U.S.C.A. § 157, and thus had violated Section 8(1) of the Act. The Board also found that by its discharge of and refusal to reinstate Roy Stevens, Jr., Clifford Gallant, Michael Sullivan and Mary Sullivan, following the strike, the respondent discriminated in regard to the hire and tenure of employment of these employees and thus violated section 8(3) of the Act.

The Board, therefore, ordered the respondent to cease and desist from its unfair labor practices, to bargain collectively with the Union, to notify each employee that the individual contracts entered into as a result of its unfair labor practices were void and of no effect, and to offer reinstatement to the four employees mentioned above. The Order of the Board is reproduced in the footnote.[2] It is this Order

---

1 "Section 8 [§ 158]. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

* * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:

* * *

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a) [159(a) of this title]." 29 U.S.C.A. § 158 (1, 3, 5).

2 "Order.

"Upon the basis of the above findings of fact and conclusions of law and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Reed & Prince Manufacturing Company, Worcester, Massachusetts, and its officers, agents, successors, and asigns shall:

"1. Cease and desist from:

"(a) Discouraging membership in Steel Workers Organizing Committee and Amalgamated Association of Iron, Steel & Tin Workers of North America, Local 1315, or in any other labor organization of its employees, by discriminating in regard to their hire or tenure of employ-

which the Board seeks here to have enforced.

It is now well settled that if the Board's findings of fact are supported by substantial evidence they are binding upon this court. Section 10(e), National Labor Relations Act; National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 85 L.Ed. ——, decided January 6, 1941; National Labor Relations Board v. Waterman S. S. Co., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126. In examining the record we must consider the evidence and all inferences arising therefrom most favorably to the Board. Opposing evidence may not be considered if it conflicts with other evidence and fair inferences. This court may not pass on the credibility of witnesses nor

---

ment or any other term or condition of employment;

"(b) In any manner giving effect to the contract or contracts executed between the respondent and its employees or some of them on July 13, 1937, and thereafter, hereinbefore described, or to any other contract or agreement concerning wages, hours, and working conditions which it may have entered into with its production, maintenance and shipping room employees or any of them, excluding supervisory and clerical employees, or the representative of such employees other than Steel Workers Organizing Committee or Amalgamated Association of Iron, Steel & Tin Workers of North America, Local 1315, in respect to rates of pay, wages, hours of employment or other conditions of employment;

"(c) Refusing to bargain collectively with Steel Workers Organizing Committee as the exclusive representative of its production, maintenance, and shipping room employees, exclusive of supervisory and clerical employees; and

"(d) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Upon request bargain collectively with Steel Workers Organizing Committee as the exclusive representative of its production, maintenance, and shipping room employees, exclusive of supervisory and clerical employees;

"(b) Offer to Roy Harold Stevens, Jr., Clifford A. Gallant, Michael C. Sullivan, and Mary P. Sullivan immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges;

"(c) Make whole Roy Harold Stevens, Jr., Clifford A. Gallant, Michael C. Sullivan, and Mary P. Sullivan, for any loss of pay they may have suffered by reason of the respondent's refusal to reinstate them, by payment to each of them of a sum of money equal to that which he would normally have earned as wages from the date of the respondent's refusal to reinstate him, to the date of such offer of reinstatement, less his net earnings during said period; deducting, however, from the amount otherwise due each of the said employees moneys received by him during said period for work performed on any Federal, State, county, municipal or work-relief projects, and pay over the amount so deducted to the fiscal agency of the Federal, State, county, municipal or other government or governments which supplied the funds for said work-relief projects;

"(d) Personally inform in writing each of its employees who has entered into one or more of the contracts described in paragraph 1(b) of this Order, that such contracts were entered into pursuant to unfair labor practices within the meaning of the National Labor Relations Act, that such contracts are null and void, and that such contracts will therefore be discontinued as a term or condition of employment and will in no manner be enforced;

"(e) Immediately post notices in conspicuous places throughout its plant, and maintain such notices for a period of sixty (60) consecutive days, stating that the respondent will cease and desist in the manner set forth in 1(a), (b), (c), and (d), and that it will take the affirmative action set forth in 2(a), (b), and (c) of this Order; and

"(f) Notify the Regional Director for the First Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.

"And it is further ordered that the Complaint be, and it hereby is, dismissed in so far as it alleges that the respondent has engaged in unfair labor practices within the meaning of Section 8(2) of the Act."

the weight or sufficiency of the testimony. National Labor Relations Board v. Waterman S. S. Co., supra, 309 U.S. at page 226, 60 S.Ct. at page 503, 84 L.Ed. 704; National Labor Relations Board v. Elkland Leather Co., 3 Cir., 1940, 114 F.2d 221, certiorari denied, November 18, 1940, 61 S.Ct. 170, 85 L.Ed. ——; cf. Texas & N. O. Ry. v. Railway Clerks, 1930, 281 U.S. 548, 558–560, 50 S.Ct. 427, 74 L.Ed. 1034. Considering the evidence in this light, we believe that it supports the facts found by the Board.

### The Refusal to Bargain.

Before 1937 no labor organization had been active at the respondent's plant, but in the middle of February, 1937, the Union commenced a membership drive among the respondent's employees. There was evidence that between the opening by the Union of its membership drive and the beginning of negotiations with the respondent on March 19, 1937, 712 out of 782 eligible employees in the designated unit had signed cards designating the Union as their representative. Later other employees joined. The respondent checked the signatures and agreed that all but sixteen were genuine. Thus there can be no doubt of the correctness of the Board's finding that on and after March 19, 1937, the Union was the designated representative of a majority of the employees in the unit. National Labor Relations Board v. Bradford Dyeing Ass'n, supra, 310 U.S. at pages 339, 340, 60 S.Ct. at page 929, 84 L. Ed. 1226.

The respondent does not dispute this finding as of March 19, but insists that the Union later lost its majority when many of its members repudiated it and signed individual contracts with the respondent. The only evidence to show the repudiation of the Union subsequent to March 19 was the signatures on the "back-to-work" petitions, with which we will deal later. If, as the Board found, these contracts were the result of unfair labor practices on the part of the respondent, they are invalid and cannot destroy the authority of the Union as the representative of the majority of the employees. National Labor Relations Board v. Bradford Dyeing Ass'n, supra; National Licorice Co. v. National Labor Relations Board, 1940, 309 U. S. 350, 60 S.Ct. 569, 84 L.Ed. 799. See International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——, decided November 12, 1940.

We will subsequently consider whether the defection of a majority of the employees from the Union was the result of such unfair labor practices, but no such contrary majority was claimed until July 12 at the earliest according to the uncontradicted testimony. All but the last of the incidents upon which the Board predicates its finding that the respondent refused to bargain collectively with the Union took place prior to this date and thus during the period when it is undisputed that the Union was the exclusive representative of the employees. If the evidence supports a finding of a refusal to bargain with the Union, it is clearly a refusal to bargain with the representatives of the employees within Section 8(5) of the Act.

In the middle of March the Union requested a conference with the respondent to discuss a collective bargaining agreement. The respondent granted the request, and the negotiations resulted in the signing of a preliminary agreement on March 19, which recognized the Union as the collective bargaining agency for such of the respondent's employees as were members of the Union. The agreement provided for a 12½ per cent wage increase, a 40-hour work week from Monday to Friday, and an eight-hour day. It also provided for further conferences not later than April 2, to negotiate a final written agreement on working conditions, wage rates, hours, and the method for the adjudication of disputes arising under the contract. Later meetings were held on April 2, 28, May 7, 10, 11 and 19, and a draft of a final contract submitted by the Union was taken as the basis of discussion.

The Board found that until April 28 very cordial relations had existed between the two parties but that on and following that date the respondent showed great hostility to the Union and a tendency to delay and hinder any negotiations by long discussion over trivial and sometimes previously agreed upon details. The respondent admitted a change of attitude but claimed it was due to the conduct of the Union organizer, Mr. Walsh, in ordering certain employees to change their hours of employment, to the authorization by the employees of a strike in the event that the negotiations failed to reach a successful conclusion, and to lack of confidence in the

C.I.O. generated by events of that hectic period. The Board, however, found that the change in attitude was partly related to the appearance of two new characters upon the scene. The lawyer who had conducted the negotiations on behalf of the respondent was replaced by his partner, Mr. Jay Clark, Jr. The latter thereafter conducted the negotiations with the respondent. On his suggestion the respondent hired Mr. Charles F. Gallagher, who described himself as "Labor Counsel to Industry". There was evidence to show that thereafter Mr. Gallagher, working behind the scenes, conceived the strategy of the respondent in its relations with the Union. The Board quoted as significant the following extract from an article written by Mr. Gallagher in a trade magazine:

"A labor crisis today demands new methods for quickly and skillfully organizing public opinion—methods which capital until recently has been too proud or too indifferent to accept. Force and bloodshed are entirely unnecessary; also the thick-headed guards, the provocative private detectives, and questionable characters of all types, who practice the so-called 'Art of Strike Breaking'. Instead of these strong armed men, a scientific staff swings into action to present the facts, to organize public opinion, to defend business against the attacks of labor racketeers. Spot news men, reporters, wire men, statistical men land at the strike headquarters. Government, Federal, State and Local laws and labor requirements are at their finger tips, or at the end of a telephone. Every conference is planned; the military strategy of warring armies is no more carefully prepared than that of a big industrial dispute. Full cooperation is given the national and local press. No favors are asked. What is wanted by the newspapers is news and the truth. They get it. The strategy of the opponent is carefully watched, checked and in many cases pre-diagnosed. Weak points are attacked; strong points call for a strong defense or counter offense."

It was for the Board to say whether a strategy so conceived was indicative of a willingness on the employer's part to negotiate in good faith with the chosen representative of his employees in a genuine effort to resolve differences and arrive at a collective agreement.

In spite of evidence showing a distinctly uncooperative and obstructionist attitude on the part of the respondent beginning with the conference of April 28 and continuing through the last conference of May 19, the Board did not find a refusal to bargain on the part of the respondent prior to June 5. By May 19, a tentative agreement had been reached between the Union and the respondent on matters of wages and hours and some minor details. There was as yet no agreement on what the Union considered to be vital parts of the proposed contract, i. e., the seniority and grievance clauses. The Union proposed that alien union members should have equal standing with citizens in determining preference for employment during lay-offs while the respondent insisted that citizenship should be a factor which it might consider. The Union also proposed the arbitration of any disputes by an impartial umpire to be selected by mutual agreement, if direct negotiations failed. The respondent claimed that settlement of grievances should be left entirely to the management and that arbitration would illegally deprive the courts and the Labor Board of their jurisdiction and deny the respondent its constitutional rights. Other proposals upon which no agreement had been reached related to holidays, access to the plant for a union delegate, adjustment of inequalities in pay rates and minimum production standards. The stenographic report of the May 19 conference shows great antagonism and unwillingness to compromise on any point on the part of the respondent, but there was no indication that a complete impasse had been reached. In fact, arrangements were made to continue the negotiations.

The Union showed some disposition to yield on various disputed sections of the contract. There is evidence to show that it considered the arbitration clause to be the most important section in its contract, and it had been frequently accepted by other companies similar to the respondent. Though the respondent claims that the Union would not retreat on any of the disputed items, and was as recalcitrant as itself, both as to the arbitration clause and the citizenship factor, there was evidence to show that the Union was anxious to be conciliatory and several times offered to make concessions on both clauses.

At the close of the May 19 conference, the Union requested a redraft of the contract as so far negotiated. Mr. Clark said it could be sent to the Union "by Wednesday sure. Maybe Tuesday". The Union

wanted it Saturday, but Mr. Clark refused to promise it because of week-end plans. The draft had not arrived on Tuesday morning, May 25, and the Union called a strike in pursuance of a previous authorization in the event negotiations proved unsatisfactory. The Union considered that the respondent was deliberately delaying negotiations. Later in the day an incomplete draft of a contract was received from Mr. Clark. It contained the items agreed upon plus proposals of the respondent to which the Union had not agreed. The letter accompanying the draft insisted that it had been typed purely out of courtesy and was not to be considered as the submission of a contract by the respondent. The letter further requested the Union to state its reason why it desired to give equal treatment to aliens. The respondent claimed to feel very strongly on this point, though its own personnel manager testified that it had always been a minor consideration with the company.

Thus matters stood on the day of the strike. At this time it is necessary to examine the legal position of the parties in order to understand the continuing obligations of the respondent toward the Union. The employees ceased work as a consequence of and in connection with a current labor dispute as defined in Section 2(9)[3] of the Act, and thus remained employees within the meaning of Section 2(3).[4] Since the striking employees retained their status and since the Union continued to represent the majority of the employees, the respondent remained legally obligated to continue to bargain with the Union. National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 344, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Somerset Shoe Co., supra, 111 F.2d at pages 681, 688. It is not necessary for the strike to be caused by an unfair labor practice. The Act expressly leaves the right to strike unaffected, and any remedies the employees had were not destroyed by remaining on strike. If after May 25, the respondent refused to bargain with the Union, it violated Section 8(5) of the Act and is subject to such orders of the Board as will effectuate the policy of the Act. Black Diamond S. S. Corp. v. National Labor Relations Board, 2 Cir., 1938, 94 F.2d 875, certiorari denied, 1938, 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542.

Although the Union had called a strike on May 25, it did not thereafter abandon its efforts to arrive at a satisfactory contract with the respondent. The purpose of the strike was an attempt to force the respondent to come to an agreement with the Union and was thought necessary because of the reluctance of the respondent seriously to discuss or attempt to negotiate on any of the disputed questions. There was evidence to show that up to the time of the strike the respondent, though agreeing with the Union on some matters, showed no disposition to consider the seriously disputed items from any other point of view than requiring a complete surrender on the part of the Union to the proposals of the respondent. However, after the calling of the strike the Union made three separate and distinct efforts to reopen negotiations with the respondent and to try to reach a negotiated agreement with it.

On June 5, 1937, Mr. Bernard, a conciliator of the United States Department of Labor conferred jointly with the Union and the respondent. Mr. Bernard suggested that an agreement could probably be reached if the respondent would accept the proposal for arbitration. There was evidence to show that the Union at this time was willing to recede from its

---

[3] "Section 2 [§ 152]. When used in this Act [sections 151 to 166 of this title]— * * * *

"(9) The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

[4] "(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act [chapter] explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

demands for a walking delegate who would have access to the plant, and also for the withdrawal of citizenship from the seniority clause. Furthermore, the proposed grievance clause made specific provision for the jurisdiction of the Labor Board. The respondent flatly refused to sign any contract other than one proposed by it on June 3, which contained proposals known to be highly objectionable to the Union. In addition, it contained a clause providing that "during the continuance of this agreement, or any extension thereof, *or at any time in the future,* the employees and the Union agree that they will not request or demand either a closed shop agreement or the check-off system so-called". (Italics ours.) Such a provision would have tied the hands of the Union for all time to come and thus would have impaired its efficacy as a collective bargaining agency; the clause would have been illegal as against the public policy expressed in the Act, in that it forestalled future collective bargaining upon matters which were "frequent subjects of negotiation between employers and employees." National Licorice Co. v. National Labor Relations Board, supra [309 U.S. 350, 60 S.Ct. 575, 84 L.Ed. 799]. Insistence by the respondent upon such an impossible provision warranted the Board in inferring that at this point and thereafter the respondent was not actuated by any genuine desire to explore the possibilities of reaching an accord with the representative of its employees, but upon the contrary was contriving to bring about a final breakdown of collective bargaining negotiations under circumstances in which respondent might plausibly "place the odium of rupture" upon the Union. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 1938, 94 F.2d 862, 872 certiorari denied, 1938, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; cf. National Labor Relations Board v. Express Publishing Co., 5 Cir., 1940, 111 F.2d 588, decree modified, 61 S.Ct. 693, 85 L.Ed. —, decided March 3, 1941.

The refusal of the respondent to negotiate further on the terms of a contract broke up the conference, and Mr. Bernard issued a statement to the press attributing the failure of negotiations to the respondent, and asserting that the proposed company contract would leave no legal redress for any employee seeking an adjustment of a grievance because the courts of Massachusetts would have no jurisdiction in labor matters except in the case of the discharge of an employee for union activities. The Board found that this statement of law was not completely accurate though it found that the courts would have no jurisdiction over normal employee grievances, as the subject matter is usually within the discretion of the employer. The respondent took advantage of this statement to demand the recall of Mr. Bernard in an abusive telegram to the Secretary of Labor, which was released to the press by the respondent. It described him as having issued "unwarranted, biased, untrue and false statements" and intimated that he and the government were allowing themselves to be made part of a scheme to defraud its employees. Mr. Bernard thereafter withdrew from the negotiations.

On June 9, the Union again attempted to negotiate a settlement. On that date Mr. Golden, the Regional Director of the Union, wrote to Mr. Reed, the respondent's president, asking a private conference between the two of them to try to obtain "an honorable and mutually satisfactory basis of the present controversy." The letter was extremely conciliatory and made no demands of any kind. Though the letter was marked "personal and confidential" copies of it were distributed by the respondent to all its employees as well as Mr. Reed's answer thereto. This answer summarily rejected the request for negotiation and was couched in most insulting terms. It accused the Union of attempting to force the respondent to sign an illegal contract, of having ulterior motives, and of desiring to "sell our employees down the river". The letter also stated that the only possible way to settle the strike was to accept the company contract of June 3, which the officers had already signed.[5]

---

[5] "You say you want an honorable and mutually satisfactory contract. This is the third time you of all people use the word 'honorable'. Very well, Mr. Golden, instruct your local C.I.O. agent to do what our employees want him to do. Sign the contract the company has already signed, and permit our many employees to return to work without further loss. That's the only answer, Mr. Golden. * * * If you really want to end this strike, Mr. Golden, there is only one answer. The contract the Company has signed contains all the clauses mutually agreed upon in collective bargaining. It is already signed by·us. All it needs is the signature of the alleged representatives of our employees on it."

The Union then attempted to negotiate with the respondent through the Massachusetts State Board of Arbitration and Conciliation, and on June 28, the representatives of the Union and the respondent met with that Board. The Union offered to leave the entire contract or any part of it to be drawn up by the Board and agreed to sign any such contract. Mr. Walsh also stated that the Union would be willing to accept arbitrators agreed upon by the company and the Union or persons designated by the Mayor of Worcester, a committee of college presidents or various judges of the Massachusetts courts. The State Board informed the parties that arbitration clauses had been found extremely useful and customary in collective contracts. The respondent, however, flatly rejected any sort of arbitration provision and informed the Board that it was quite capable of writing its own contracts. At the conclusion of the meeting the Union's attorney proposed further negotiations, and Mr. Clark refused as he desired to await the outcome of the equity suit which he had instituted in the state court in order to enjoin the strike.

About July 15, the Mayor of Worcester at the request of the Union, tried to induce the respondent to negotiate. This suggestion was also rejected on the ground that at that time a majority of the employees had returned to work under individual employment contracts with the respondent and had repudiated the Union.

It is partly upon the evidence of these four attempts to secure further negotiations that the Board found that the respondent was guilty of a refusal to bargain collectively with the Union. The Board found further evidence of a refusal to bargain in good faith in that all during this time, while the Union was attempting to reopen negotiations, the respondent, under the guidance of Mr. Gallagher, was engaged in a deliberate effort to undermine the Union and influence the employees to abandon it and bow to the respondent's will. This was attempted through various subtle manoeuvres, open

propaganda, and inferential interference and coercion.

As has been stated, on June 3 the respondent executed and submitted to the Union an obviously unacceptable and partially illegal proposed contract. This was accompanied by an inflammatory letter which was distributed to the employees and was obviously designed for their consumption.[6] From then on its efforts were bent to influencing its employees to force the Union to accept that contract and no other.

The respondent also launched a blatant campaign of abuse against the Union and its leaders, coupled with suggestions to its employees as to the proper course for them to follow. This was done through the medium of mimeographed articles, bulletins, cartoons, reprints of correspondence, and copies of a radio address given by the respondent's president. All of these were published and distributed to the employees. The campaign was aimed primarily at discrediting the Union in the eyes of its members, which was done by outright abuse and name-calling, by describing the Union as "alien and un-American", and by insisting that it was interested only in the money which it would be able to take from the workers in union dues and assessments. Throughout all the publications ran more or less openly the theme that the only way for the employees to get back to work was to force the Union to accept the company contract. The threat was only thinly veiled that the acceptance of that contract was a *sine qua non* of reemployment. The respondent also reiterated the charge that the Union was not following the wishes of a majority of its members but was seeking to advance its own interest at their expense. While denying any intention to interfere, the respondent suggested ways for the employees to force the Union to accept the respondent's terms and solicited letters from the employees regarding the strike.

The Board found that this entire campaign was not merely the expression of the respondent's opinions for the purpose of defending its good name, as claimed by

---

6 The contract provided a grievance procedure and wage adjustment which had previously been specifically rejected by the Union. No access to the plant for a Union delegate and no pay for holidays was provided. The Union was to agree never in the future to request a closed shop or check-off system.

The letter declared that the C.I.O. mis-

informed and misled the respondent's employees, disliked citizens and desired to exalt aliens. It further stated that the law "for the present" forced the respondent to deal with the Union, but that many unsolicited letters from employees showed that they desired the Union to accept the company contract.

the respondent, but was a deliberate attempt to break the Union and to interfere with and coerce its employees in their right of self-organization in order to relieve the respondent from the necessity of further bargaining. See National Labor Relations Board v. Remington Rand, Inc., supra, 94 F.2d at page 870.

The respondent, following the beginning of the strike, was legally bound to confer and negotiate sincerely with the representatives of its employees. It was required to do so with an open mind and a sincere desire to reach an agreement in a spirit of amity and cooperation. The cases setting forth this obligation are many, and it is well settled that a mere formal pretence at collective bargaining with a completely closed mind and without this spirit of co-operation and good faith is not a fulfillment of this duty. E.g., M. H. Ritzwoller v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 432; National Labor Relations Board v. Somerset Shoe Co., supra; National Labor Relations Board v. Express Publishing Co., supra; National Labor Relations Board v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474; National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 1939, 106 F.2d 713, 723; Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 1939, 103 F.2d 91.

While it is true that the Act does not require the reaching of an agreement, National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, 301 U.S. at page 45, 57 S.Ct. at page 628, 81 L.Ed. 893, 108 A.L.R. 1352, there was abundant evidence before the Board from which it could find that the respondent refused to bargain collectively with the representatives of its employees by specifically rejecting proffered opportunities for negotiation, by seeking to undercut the authority of the Union as representative of its employees and by going through the motions of bargaining with a complete absence of the good faith required by the statute. The respondent was properly held to have violated Section 8(5) of the Act.

The respondent claims that it was relieved of the obligation to bargain collectively with the Union because, it is asserted, the strike was unjustifiably called by the latter, while negotiations were progressing. Whether the change in temper and attitude manifested by the respondent constituted substantial provocation for the strike, we need not decide, for we do not believe that the justification or lack of justification for the strike is relevant. National Labor Relations Board v. Mackay Radio & Telegraph Corp., supra, 304 U.S. at page 344, 58 S.Ct. at page 910, 82 L.Ed. 1381. The strike was in consequence of a current labor dispute and thus, as pointed out above, the strikers remained employees. The respondent is under an obligation to bargain with the representative of its employees. If the Union desires to bargain collectively notwithstanding previous delinquencies, the respondent may not refuse. National Labor Relations Board v. Remington Rand, Inc., supra, 94 F.2d at pages 872, 873. There was no reason to believe that the negotiations requested, if conducted in good faith, might not have led to a settlement, even though the prior negotiations had not been successful. Jeffrey-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 1937, 91 F.2d 134, 139, 140. If in the presence of a strike an employer could avoid the obligation to bargain by declaring further efforts to be useless, the Act would largely fail of its purpose.

It is further contended that the respondent was relieved from the statutory duty to bargain with the Union as representative of its employees because the strike called by the Union was considered by state law to be for an illegal purpose. In a suit brought by the respondent against the strikers the Superior Court, sitting at Worcester, on July 12, 1937, enjoined the further prosecution of the strike on the ground that its purpose was illegal in that it sought to force the employer to sign a contract "substituting compulsory arbitration for due process of law." It is not easy to understand the theory on which this conclusion was based; and the Massachusetts decisions cited in support of the proposition seem to us distinguishable on their facts. Folsom Engraving Co. v. McNeil, 1920, 235 Mass. 269, 126 N.E. 479; Reynolds v. Davis, 1908, 198 Mass. 294, 84 N. E. 457, 17 L.R.A.,N.S., 162. However, in view of the decree of the Superior Court, we may, perhaps, for the purposes of this case, be required to assume the Massachusetts law to be as there indicated. But assuming the strike to have been tortious by state common law, the strikers remained employees of the respondent since the strike was a consequence of or in connection with a current labor dispute. See § 2(3), National Labor Relations Act, supra. The strike not having been provoked by

any antecedent unfair labor practice, the employer could have proceeded to fill the places of the strikers with other men. National Labor Relations Board v. Mackay Radio & Telegraph Co., supra. The respondent did not do this, however, but continued to treat the strikers as its employees and exerted itself to stampede the employees back to work. See Stewart Die Casting Corp. v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 849, 855, 856, certiorari denied January 13, 1941, 61 S.Ct. 449, 85 L.Ed. ——. In these circumstances we find nothing in the Act which relieves the employer from the obligation to bargain collectively with its employees through their chosen representative.

An additional argument by the respondent is that because the Union at the outset insisted on bargaining for its own members only and not for all the employees, the respondent was relieved of the obligation of bargaining with the Union.

■ It is true that where a Union or other bargaining agent has been selected by a majority of the employees in an appropriate unit, the employer's statutory duty is to bargain with the chosen union as the exclusive representative of all the employees in the unit. §§ 8 (5), 9 (a), National Labor Relations Act, supra. The employer would be in violation of Section 8 (5) if he insisted on recognizing the Union only as representing its members and bargaining on that basis. National Licorice Co. v. National Labor Relations Board, supra, 309 U.S. at page 358, 60 S.Ct. at page 574, 84 L.Ed. 799; Bethlehem Shipbuilding Co. v. National Labor Relations Board, 1 Cir., 1940, 114 F.2d 930. So if the Union declines to accept its responsibility as exclusive representative of all the employees in the unit, and insists on bargaining only for its own members, the employer would commit no violation of the Act in refusing to bargain on that basis.

■ In the case at bar the Union on April 20, 1937, submitted to the respondent as a basis of discussion a draft contract in which the Union described itself as acting on behalf of its members only. The respondent at one of the early conferences objected on this score, and after some discussion of the point an understanding was reached that the Union would be designated in the contract as representing its own employees but that the respondent would give notice that the provisions of any contract signed with the Union would be extended to all the employees in the unit whether they were Union members or not. Thereafter the negotiations proceeded with this understanding, which meant that the Union in effect was bargaining for all the employees in the unit. When Mr. Golden, as regional director of the Union, wrote to the respondent on June 9 asking for a bargaining conference, he expressed "the hope that a way may be found to effect an honorable settlement of the controversy between our organization *representing your employees* and your company". (Italics ours.) In rejecting this proffer the respondent did not take the ground that the Union was not bargaining on behalf of the proper unit. Under the circumstances the Board correctly held that there was no merit in this technical point raised by the respondent as an afterthought to excuse its refusal to bargain with the representatives of its employees.

Accordingly, paragraphs 1 (c) and 2 (a) of the Board's Order will be enforced.

### The Nullification of the Contracts with the Respondent.

The Board further found that the "back-to-work" movement and the subsequent contracts between the employees individually and the respondent were the results of the unfair labor practices of the respondent in interfering with its employees. Accordingly, in paragraphs 1 (b) and 2 (d) it ordered the respondent to cease giving effect to the contracts signed with the individual employees or the so-called collective agreement executed by attaching to the company contract the employees' signatures on the "back-to-work" petitions, and ordered the posting of notices to the effect that these contracts were null and void. We believe these portions of the order to be proper.

After the strike was called, the refusal of the respondent to bargain with the Union as required by law was coupled with an effort to discredit the authority of the Union as representative of the employees and to force the employees to repudiate the Union and make separate arrangements with the company. Three weeks after the strike began the respondent's unfair labor practices apparently began to bear fruit. On June 10, two employees, sought the aid of Mr. Johnson, an attorney, in getting them back to work. They said they believed a majority of the employees wished to sign the company contract. After unsuccessful attempts to gain the support of

the Union by a vote to accept the respondent's contract, a manoeuvre frequently suggested by the respondent, "back-to-work" petitions were circulated declaring a desire to return to work and authorizing the annexation of the signatures of the signers to the company contract. There was evidence that the acceptance of the company contract was considered a necessary condition of returning to work, and it was so suggested in the petition and the preceding literature.

Mr. Clark having been informed of these negotiations, refused to deal with the employees until a majority had signed the petitions. By July 12, a majority had signed. Mr. Walsh rejected a final opportunity to sign the company contract on behalf of the Union, and the signatures were thereupon annexed to the contract. The plant reopened on July 14. Thereafter, 107 additional signatures were affixed, though the Board found that this was the result of a desire on the part of the signers not to have themselves set apart from the majority in the eyes of the respondent rather than a wish to accept the contract.

The contract to which these signatures were attached was in no sense the product of collective bargaining. Neither had there been any negotiations between the individuals and the company as to the terms of the contract. Furthermore, this contract contained the offensive provision, already alluded to, requiring the employees to agree that neither individually nor as members of any union would they at any time in the future request a closed shop agreement or the check-off. The making of such a stipulation, as a condition of employment, was itself an unfair labor practice in that it imposed a restraint upon the employees in the exercise of their right to bargain collectively in the future. While the "back-to-work" movement was not found to have been engineered by the respondent, there was ample evidence to support the finding that the acceptance of the contract was brought about by the respondent's interference with its employees and its refusal to bargain with the Union. Under such circumstances like contracts have been voided on the ground that an employer may not reap the fruits of his illegality by thus being allowed to eliminate a designated union as the bargaining agency of its employees. National Labor Relations Board v. Bradford Dyeing Ass'n, supra; National Licorice Co. v. National Labor Relations Board, supra; American Mfg. Co. v. National Labor Relations Board, 1940, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988, affirming 2 Cir., 1939, 106 F.2d 61; National Labor Relations Board v. Elkland Leather Co., supra; cf. Texas & N. O. Ry. v. Railway Clerks, supra.

Paragraphs 1 (b) and 2 (d) of the Order will be enforced. Paragraph 2 (d), however, must be amended to read as follows: "Personally inform in writing each of its employees who has entered into one or more of the contracts described in paragraph 1 (b) of this Order, that such contracts were entered into in violation of the National Labor Relations Act, and that the respondent will no longer offer, solicit, enter into, continue, enforce or attempt to enforce such contracts with its employees; but this is without prejudice to the assertion by the employees of any legal rights they may have acquired under such contracts." National Licorice Co. v. National Labor Relations Board, supra, 309 U.S. at pages 366, 367, 60 S.Ct. at page 578, 84 L.Ed. 799.

### The Discrimination in Reinstatement.

Next, the respondent contends that the finding of the Board that four employees were denied reinstatement because of their union activities was not supported by evidence. The respondent claims that it was justified in not reinstating the four employees and was not guilty of a violation of Section 8 (3) of the Act. It asserts for these reasons that the Board erred in ordering the reinstatement of the employees and the granting to them of back pay from the date of refusal to reinstate. It is our opinion that the Order of the Board in this regard should be enforced.

On July 12, at the respondent's instance, a preliminary injunction was issued by the Superior Court prohibiting all strike activity and picketing on the theory that the strike was illegal as an attempt to obtain an arbitration provision. After notifying its employees that they might return to work without discrimination, the respondent opened its plant on July 14, and 249 employees returned to work. The strike was not called off, however, and on July 15, a large group of Union members picketed about 200 feet from the respondent's plant, among whom were the four employees here involved. Many persons, including these four employees, yelled "scab" and "rat" at the employees in the plant, and

shortly after noon some police officers arrested the four employees and charged them with a breach of the peace. The four employees were Roy Stevens, Clifford Gallant, Michael Sullivan and Mary Sullivan. The first three were officers of the Union. Stevens was also a member of the bargaining committee which had met with the respondent. Mary Sullivan was a sister of Michael Sullivan.

Later in the afternoon the strike was called off and the members of the Union sought to return to work. All of them were reinstated with the exception of the four mentioned above. The evidence showed that the respondent had knowledge that most if not all of those reinstated had violated the injunction and shouted opprobrious epithets also. These four employees were informed by the respondent that they would not be reinstated until they had cleared themselves of the charges against them.

At their trial for breach of the peace, Mr. Clark, the respondent's attorney, prosecuted them. At the close of the evidence the judge placed their cases on file, which according to the stipulation between the parties at the hearing before the trial examiner "means that there was no record in the case which could be used to impeach a witness and that at any time the complaint could be taken out of the file and the defendants found either guilty or not guilty". This stipulation was the basis for the finding of the Board that the four members were neither acquitted nor convicted.[7] The respondent, however, refused to reinstate them on the ground that they had not cleared their names of the charges. The three men reapplied for reinstatement and were refused, but Mary Sullivan, knowing of the respondent's position from her brother, Michael Sullivan, did not reapply. The respondent admitted that had she done so, she would have been refused.

The respondent insists that its sole reason for refusing to reinstate these employees was their failure to clear themselves of the charges against them. We have already alluded to the fact that the respondent never purported to discharge the body of employees for engaging in the strike—a strike which may have been tortious under special doctrines of local law. When the strike was over, and all the employees were taken back except these four, the refusal to let them resume their jobs was in substance a discharge at that time. The Board was warranted in finding that the respondent in thus discharging these employees was not motivated by a purpose of vindicating public justice on account of trivial breaches of the peace of which these four employees—as well as many others—may have been guilty, and in finding, rather, that the breaches of the peace served only as a pretext, and that the respondent visited the penalty of discharge upon outstanding Union leaders as part and parcel of a studied policy of breaking up the Union. Such action was a violation of Section 8 (3). See National Labor Relations Board v. Mackay Radio & Telegraph Co., supra, 304 U.S. at pages 346, 347, 58 S.Ct. at page 911, 82 L.Ed. 1381. National Labor Relations Board v. Fansteel Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, is not applicable to bar a Board order reinstating employees guilty of minor breaches of peace on the picket line. Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, at page 479, certiorari denied on this point, 1940, 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1027; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 1939, 105 F.2d 167, 176. See National Labor Relations Board v. Colten, 6 Cir., 1939, 105 F.2d 179, 183.

■ Paragraphs 1 (a) and 2 (b) and (c) of the Board's Order must be enforced with one modification. Pursuant to the decision of the Supreme Court in Republic Steel Corp. v. National Labor Relations Board, 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. —, we will order stricken that portion of paragraph 2 (c) reading "deducting, however, from the amount otherwise due each of the said employees moneys received by him during said period for work performed on any Federal, State, county, municipal or work-relief projects, and pay over the amount so deducted to the fiscal agency of the Federal, State, county, municipal or other government or governments which supplied the funds for said work-relief projects".

---

[7] Strictly speaking, there has been a finding of guilt, as is apparent from the notations on one of the complaints for breach of the peace included as an exhibit in the case at bar. But when the case is placed on file this finding of guilt is not followed by a judgment sentencing the offender, unless it is subsequently taken off file for that purpose.

Interferences with the Employees' Rights.

As for the respondent's campaign against the Union, the Board found that "by disseminating this anti-union propaganda the respondent has interfered with, restrained and coerced its employees in the exercise of the rights guaranteed them in Section 7 of the Act". The respondent claims that this finding raises a constitutional issue of freedom of speech, citing National Labor Relations Board v. Ford Motor Co., 6 Cir., 1940, 114 F.2d 905, certiorari denied, February 10, 1941, 61 S.Ct. 621, 85 L.Ed. ——; 54 Harv.L.Rev. 344.

■■■ As an abstract proposition it may be conceded that "The constitutional right of free speech * * * in regard to labor matters is just as clearly a right of employers as of employees". Continental Box Co. v. National Labor Relations Board, 5 Cir., 1940, 113 F.2d 93, 97. This is especially true in a case like the present one, where there has been a hitch in collective bargaining negotiations and the Union has called a strike not provoked by an unfair labor practice. The employer in such a case must be privileged to publish to his employees, and to the public at large, his version of the breakdown of negotiations and of the points at issue. And this privilege cannot be confined too narrowly by objective canons of reasonableness of argument and temperateness of expression. Cantwell v. Connecticut, 1940, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352.

On the other hand, the Supreme Court said in Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 61 S.Ct. 552, 555, 85 L.Ed. ——, decided February 10, 1941:

"It must never be forgotten, however, that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an appeal to reason by all the peaceful means for gaining access to the mind. It was in order to avert force and explosions due to restrictions upon rational modes of communication that the guarantee of free speech was given a generous scope. But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."

This was said in upholding a state court injunction forbidding picketing, including peaceful picketing, "the working man's means of communication". Cf. Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874. The argument can be turned against an employer in comparable circumstances. Anti-union propaganda addressed by an employer to his employees may be more than a mere expression of opinion, may "lose its significance as an appeal to reason", in a context of violence, intimidation or coercion. At this point the employer's constitutional right of free speech ends. System Federation No. 40 v. Virginian Ry., D.C. E.D. Va.1935, 11 F. Supp. 621, 624, 633, affirmed, 4 Cir., 1936, 84 F.2d 641, 643, affirmed, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; National Labor Relations Board v. Elkland Leather Co., supra; Virginia Ferry Corp. v. National Labor Relations Board, 4 Cir., 1939, 101 F.2d 103. In Continental Box Co. v. National Labor Relations Board, supra, 113 F.2d at page 97, the court said: "The employer has the right to have and to express a preference for one union over another so long as that expression is the mere expression of opinion in the exercise of free speech and is not the use of economic power to coerce, compel or buy the support of the employees for or against a particular labor organization." But the difficulty with the practical application of a formula of this sort is that "intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge". National Labor Relations Board v. Link-Belt Co., supra [61 S.Ct. 366, 85 L.Ed. ——]. As the Supreme Court said in International Ass'n of Machinists, etc., v. National Labor Relations Board, 1940, 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. ——: "Known hostility to one union and clear discrimination against it may indeed make seemingly trivial intimations of preference for another union powerful assistance for it. Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure." The same thought was expressed by Judge Parker in Virginian Ry. v. System Federation No. 40, 4 Cir., 84 F.2d 641, 643, where he said: "It must be remembered in this connection, however, that any sort of influence exerted by an employer upon an employee, dependent upon his employment for means of livelihood, may very easily become undue, in that it will coerce the employee's will in favor of what the employer desires, against his bet-

ter judgment as to what is really in the best interest of himself and his fellow employees."

The problem of striking a balance between the important conflicting interests involved is one of peculiar gravity and delicacy. For this reason, the approach of the courts toward a fair and workable solution must needs be cautious, and an opinion on the subject should not go beyond the exigencies of the particular case. In the present case we are not required to decide whether the company's campaign of publicity and propaganda conducted a couple of weeks during the strike in 1937 constituted a separate and independent unfair labor practice. Without intimating any opinion as to the correctness of the decision in National Labor Relations Board v. Ford Motor Co., supra [114 F.2d 909], it is to be noted that the Board's order in that case specifically commanded the company to cease and desist from "interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act *by circulating, distributing or otherwise disseminating among its employees statements or propaganda which disparages or criticizes labor organizations or which advises its employees not to join such organizations*". (Italics ours.) This portion of the Board's order, the court in the Ford case declined to enforce. In the case at bar the Board did not specifically order the respondent to cease and desist from disseminating among its employees statements disparaging labor organizations or advising its employees not to join such organizations. The Board in its decision pointed out that the propaganda was directed to its employees "in an effort to forestall bargaining with their duly designated representatives"; the propaganda was thus a phase of the refusal to bargain. But there is ample evidence to sustain the Board's finding of a violation of Section 8 (5) without the necessity of our ruling that the propaganda, in and of itself, constituted an unfair labor practice.

The order under review commands the employer in general terms, in paragraph 1 (d), to cease and desist from "in any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act". This general provision has been included in all Labor Board orders where the employer has been found guilty of any of the unfair labor practices described in Section 8 of the Act. National Labor Relations Board v. Jones & Laughlin Steel Co., supra; Bethlehem Shipbuilding Corp. v. National Labor Relations Board, supra; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 1940, 110 F.2d 632, 639; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652, 660, 661. The Board's justification for the general cease and desist order has been that the unfair labor practices described in subsections (2), (3), (4) and (5) of Section 8 are species of the generic unfair labor practice defined in Section 8 (1). Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 1940, 110 F.2d 148, 150.

But in National Labor Relations Board v. Express Publishing Co., March 3, 1941, 61 S.Ct. 693, 697, 85 L.Ed. ——, the Supreme Court for the first time had occasion to criticize the breadth of a Board order directing the employer to cease and desist from "in any manner interfering with, restraining, or coercing its employees in the exercise of their rights" as guaranteed in Section 7 of the Act. That was a case where the only specific unfair labor practice found by the Board was a refusal to bargain in violation of Section 8 (5), which, as the court recognized, was also a technical violation of Section 8 (1). Mr. Justice Stone pointed out that the breadth of the order, like the injunction of a court, "must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past". It was recognized that in several cases, arising both under the National Labor Relations Act and under the Railway Labor Act, the Supreme Court had approved cease and desist orders in broad terms substantially like paragraph 1 (d) of the order now under review. But in them, the court said "the unfair labor practices did not appear to be isolated acts in violation of the right of self-organization, like the refusal to bar-

gain here, but the record disclosed persistent attempts by varying methods to interfere with the right of self-organization in circumstances from which the Board or the court found or could have found the threat of continuing and varying efforts to attain the same end in the future". In the Express Publishing Company case the court did not think that a mere refusal to bargain in violation of Section 8 (5), unaggravated by other unfair labor practices, was sufficient to warrant an order in the broader form. It therefore modified the general order of the Board so as to make it require only that the employer should cease and desist from "in any manner interfering with the efforts of the Guild to bargain collectively with Express Publishing Company".

In the case at bar there was more than a mere refusal to bargain, in violation of Section 8 (5). There was also, as we have seen, a violation of Section 8 (3) in the discriminatory discharge of four employees. Further, there was a violation of Section 8 (1) in signing up the employees under individual contracts which imposed a restraint upon them in the exercise of their right to bargain collectively in the future as a result of provisions in the contracts which forestalled future collective bargaining upon matters which are frequent subjects of negotiation between employers and employees. It would seem that the conjunction of these three unfair labor practices would justify the broader form of cease and desist order, consistent with the scope of the reasoning in the Express Publishing Company case. We are led to this conclusion by an examination of National Labor Relations Board v. Mackay Radio & Telegraph Co., supra, where a general cease and desist order was held within the competence of the Board though the only specific unfair labor practice found was the discriminatory refusal of the employer to rehire certain of the strikers after the collapse of a strike which had not been provoked by an unfair labor practice.

If we undertook to modify the Board's order following the pattern of the modification in the Express Publishing Company case we do not think that the effect of the order in its present broader form would as a practical matter be much altered. After the specific cease and desist orders in paragraph 1 (a), (b) and (c), we would further order the respondent to cease and desist from "in any manner interfering with the efforts of the Steel Workers' Organizing Committee to bargain collectively with Reed & Prince Mfg. Co."; and to cease and desist from "in any manner discouraging membership in Steel Workers' Organizing Committee and Amalgamated Association of Iron, Steel & Tin Workers of North America, Local 1315, or in any other labor organization of its employees". In the Express Publishing Company case the Supreme Court recognized that a subsequent "discriminatory discharge of union members may so affect the bargaining process as to establish a violation" of the modified order. So in the case at bar, a future violation of Section 8 (2), for example, by promoting and dominating a company union would have a tendency both to interfere with the efforts of the Steel Workers' Organizing Committee to bargain with the respondent and to discourage membership in such labor organization. Indeed, it would not take much ingenuity to find that almost any kind of unfair labor practice, manifesting hostility to one union, or favoritism to another, would have the effect of encouraging or discouraging membership in a labor organization, and thus would be a contempt of the decree in the form suggested. Hence there would not seem to be much point in modifying paragraph 1 (d) of the Board's order as it now stands.

We therefore think that under the circumstances here disclosed the broader prohibition as appears in paragraph 1 (d) of the Board's order is within the discretion of the Board and should be enforced.

Since paragraph 1 (d) of the Order requiring the respondent to cease and desist from interfering with the exercise of the rights of the employees under section 7 can be enforced on the above grounds, it is unnecessary to decide whether or not the Board was justified in finding that the dissemination of anti-union literature, in the particular circumstances of this case, was in itself a forbidden form of interference.

Paragraph 2 (e), dealing with the posting of notices, will be modified by striking from it the words "will cease and desist" and substituting for them the words "will not engage in the conduct from which it is ordered to cease and desist". National Labor Relations Board v. Express Publishing Co., supra.

A decree will be entered enforcing the order of the Board with the modifications of paragraphs 2 (c), (d) and (e) as previously indicated.

McLELLAN, District Judge (concurring.)

To the extent that the majority opinion indicates there was sufficient evidence to warrant enough of the Board's findings to support the order, as modified, I concur therein and think the decree there directed should be entered.