## NATIONAL LABOR RELATIONS BOARD v. REED & PRINCE MFG. CO.

No. 3549.

Circuit Court of Appeals, First Circuit.

Sept. 16, 1942.

Robert B. Watts, Gen. Counsel, and Ernest A. Gross, Associate Gen. Counsel, both of Washington, D. C., for petitioner.

Jay Clark, Jr., and George H. Mason, both of Worcester, Mass., for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

The National Labor Relations Board has petitioned this court to adjudge Reed & Prince Manufacturing Company, its officers and agents, and in particular its President, Chester T. Reed, its Treasurer, Alden Reed, and its Manager of Industrial Relations, George H. Taylor, in contempt for failure to comply with our decree entered April 2, 1941. 118 F.2d 874.

Respondent in its sworn answer denies that George H. Taylor is in any way responsible for its corporate policy or the carrying out of the decree and since the Board has not pressed this point upon us, we consider him to be withdrawn from the scope of this opinion.

The order of the Board as affirmed by this court, insofar as it is pertinent to this cause, is as follows: That respondent

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

\*   \*   \*   \*   \*   \*

"(b) Offer to Roy Harold Stevens, Jr., Clifford A. Gallant, Michael C. Sullivan, and Mary P. Sullivan immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges;

"(c) Make whole Roy Harold Stevens, Jr., Clifford A. Gallant, Michael C. Sullivan, and Mary P. Sullivan for any loss of pay they may have suffered by reason of the respondent's refusal to reinstate them, by payment to each of them of a sum of money equal to that which he would normally have earned as wages from the date of the respondent's refusal to reinstate him, to the date of such offer of reinstatement, less his net earnings during said period.

\*   \*   \* "

While the name of Mary P. Sullivan appears in the decree as one of the employees to be reinstated and made whole, there is no dispute as to her.

The parties are in agreement as to the periods of employment and earnings of Roy Harold Stevens, Jr., and Clifford A. Gallant and have filed a stipulation to this effect. They have, however, been unable to agree upon the sums which Michael Sullivan would have earned and the period of his employment. A stipulation with reference to these issues covering certain undisputed facts has been entered into by the parties. Certain records of the company showing the employment, lay off, and earnings of its employees have been presented to us. Memoranda and reply memoranda analyzing these records have also been filed. The only issue upon which the parties disagree as to the sums due Clifford A. Gallant and Roy Harold Stevens, Jr., is the proper interpretation of 2(c) of the Board's order as affirmed by our decree. We defer a consideration of this question until we have disposed of the controversial issues concerning the period of Michael Sullivan's employment.

The Board contends that the position which Michael Sullivan filled as an annealer in Department 5 was continuously in existence from the time of his discriminatory discharge on July 26, 1937, until the date on which he was offered reinstatement, June 10, 1941, and that had Sullivan not been wrongfully discharged he would have had employment for the full four year period. His earnings as an employee of the respondent would then have totaled $6,303.61 and according to the Board's figures the respondent owes him $1,885.33. The respondent denies that Sullivan would have worked for the full four year period and sets up in its answer certain hypothetical dates on which he would have been laid off and reemployed in regular course of business had there been no discriminatory discharge. In determining when Sullivan would have been laid off respondent selects a date upon which it laid off a man in his department with next greater seniority. In order to determine when Sullivan would have been reemployed it selects a date on which the first man with less seniority than Sullivan was taken on in the same department. According to its contention, Sul-

livan would have been laid off February 14, 1938, and reemployed January 20, 1941, and would have earned as an employee of the respondent the sum of $1,808.38. Since he earned in outside employment the sum of $4,418.28 respondent claims it owes him nothing.

It is contended by the respondent that the burden of proof in a contempt proceeding is upon the petitioner and that the Board in this case has failed to prove by a preponderance of the evidence that Sullivan would have been employed for the full four year period and that even if the Board has satisfactorily proved that Sullivan would have been employed for part of this period, it has not shown that the amount which he would have earned as an employee of the company is larger than the amount that he earned in outside employment. Since the issue in this case is the determination of the sums due him, respondent claims that the Board has failed to prove that it is in contempt as regards this employee. While the Board does not categorically deny that it has the burden of proving respondent's contempt, nevertheless, it states that the respondent has set up an affirmative defense, that is, the hypothetical dates chosen by it to indicate the period of normal employment and unemployment of Sullivan. Petitioner contends that respondent has failed to sustain its burden as regards these dates.

We agree that the burden of proof in a contempt proceeding is upon the petitioner, National Labor Relations Board v. Rath Packing Co., 8 Cir., 1941, 123 F.2d 684; National Labor Relations Board v. Little Rock Furniture Mfg. Co., 8 Cir., 1941, 123 F.2d 868; National Labor Relations Board v. Tupelo Garment Co., 5 Cir., 1941, 122 F.2d 603 but we cannot lose sight of the fact that all of these issues arise from the discriminatory discharge of this employee. Because of his labor activities, Sullivan was unlawfully deprived of his position for the full four year period. What respondent would have actually done as regards Sullivan's employment is, of course, a matter of hindsight. Certainly it is in a better position to come forward with evidence that Sullivan would not have worked for the full four year period, as the Board contends. If the respondent pursued a particular employment policy in relation to its employees, that knowledge is peculiarly within its possession. Cf. Montgomery Ward & Co. v. National Labor Relations Board, 7 Cir., 1939, 107 F.2d 555, 560; National Labor Relations Board v. Remington Rand Company, 2d Cir., 1938, 94 F.2d 862, 872, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540, rehearing denied Remington Rand v. United States, 304 U.S. 590, 58 S.Ct. 1054, 82 L.Ed. 1549. It is not enough for it to deny that Sullivan would have worked for the full period. The respondent by its statement of its employment policy and its selection of certain hypothetical dates upon which it would have laid off and reemployed Sullivan has recognized the burden upon it. From what we shall say hereafter, however, it is clear that we do not believe that the respondent has come forward with adequate evidence. Its failure to do so adds force to the position of the Board.

The respondent asserts that it pursued consistently its lay off policy which is based upon factory seniority without prejudice to Sullivan and had he not been discriminatorily discharged it would have laid him off in the normal course of events because of a severe depression which caused a curtailment in the number of its employees. A good statement of what this employment policy is may be found in the answer of the respondent. "During periods of depression, lack of business, lack of work, it had long been the policy of the company in making lay offs to make interdepartmental transfers, transfers within the department, stagger work, or lay off, all for the purpose of retaining key men, valuable men and efficient men with longer service records in preference to men of less seniority and no greater efficiency, and that the respondent company has never had a policy of job seniority." Assuming that this is respondent's policy, we believe that the Board is entitled to hold respondent strictly to it insofar as it affects the lay off of Sullivan. It is admitted by the parties that work in department 5 (Sullivan's department) is essentially unskilled. The most important single factor in determining whether a man in this department would be retained or laid off in a period of depression is his length of service in the company's employ. Respondent argues that no man in department 5 who succeeded Sullivan had less factory seniority and, therefore, it cannot be said that the company failed to apply consistently its lay off policy. Respondent does not establish its impartiality as regards Sullivan merely by

introducing evidence which shows that none of the employees who succeeded him had less seniority. It is uncontroverted that certain employees with less factory seniority were retained throughout the plant for the full four year period. Moreover, as the Board points out, among the entire production force in respondent's employ in February, 1938, there were about 50 employees with less than four years five months seniority, Sullivan's seniority record, who were retained and that on the basis of the rate of pay as an index of relative value, he should have superseded any one of 44 employees with less factory service on jobs which required less or no more skill than did the work of an annealer in department 5. There is evidence in the records before us that had the respondent pursued its policy of interdepartmental transfers, Sullivan would have been retained at his position or would have been transferred to another department to succeed an employee with less seniority. As an example of respondent's failure to follow consistently its policy of interdepartmental transfers, there is evidence that during the period from February 14, 1938, to January 20, 1941, 53 men were employed at some time in department 23, all of whom had less seniority and were paid lower rates than Sullivan. Another example of respondent's inconsistent application of its policy of transfers is to be found in the lay off of certain men employed in department 5 with less factory seniority than Sullivan who were later reemployed in other departments at dates much earlier than that set for his reemployment. Further the Board contends that some 282 employees were hired in all departments subsequent to February 14, 1938, and prior to January 20, 1941, and of this number 266 positions required no greater experience and none of these employees received a higher rate of pay than Sullivan. While this fact does not prove that Sullivan would have been employed for the full four year period, it does demonstrate that respondent's hypothetical reemployment date upon which it places great stress is erroneous.

In reply to the contention that it did not pursue consistently its policy of lay offs and that a lay off of Sullivan on February 14, 1938, would have been discriminatory, respondent asserts that some 150 employees with equal or greater seniority than Sullivan were laid off during 1938. It also argues that the Board has not introduced any evidence showing that Sullivan was able to perform any of the jobs to which it says he might have been transferred. It is conceded by respondent that it retained for the full four year period some employees with less seniority than Sullivan but states that it did this only because it sought to keep a nucleus so that when the depression passed it would have an organization to commence work on a normal scale. It is true that the records indicate the aforementioned 150 employees were laid off during 1938 but it is also true that a number of these employees returned to work prior to the hypothetical date selected by respondent for Sullivan's return. It cannot be said that because 150 employees were laid off during the period which respondent contends Sullivan would have been laid off, it necessarily follows that Sullivan would have been forced out of work. Nor is the argument that the Board has failed to prove that Sullivan was qualified to work in other departments of great force. It seems perfectly proper to assume that an employee who had worked in the plant for a considerable length of time and who had three years of college training was able to perform unskilled work at the same rate of pay which he received as an employee in department 5. Particularly is this true when we consider that this employee had no opportunity to demonstrate to his employers his ability to perform other tasks because of his discriminatory discharge.

We know as a fact that Sullivan's position was in existence for the full four year period; that certain employees of the respondent whose work was of no greater skill remained in the employ of the company for the full four year period; that the company made transfers inconsistent with its so called policy of interdepartmental transfers and that the company reemployed or employed for the first time a good many employees at dates much earlier than that set for the hypothetical return of Sullivan. Viewing this case in its proper context, we believe that the inference is warranted that had Sullivan not been discriminatorily discharged he would have been employed for the full four year period in department 5, or transferred to another department at an equal rate of pay.

We, therefore, hold that the respondent owes Michael Sullivan the difference between what he would have earned as an

employee of the company for the full four year period and the sum which he earned in outside employment.

We come now to a consideration of the proper interpretation of 2(c) of our decree. Respondent contends that it is entitled to deduct from the amounts that Gallant and Stevens would normally have earned from it, but for their discriminatory discharge, amounts they respectively earned elsewhere during the period in question, despite the fact that these employees would normally have been unemployed for a part of this time.

The petitioner asserts that such an interpretation of our decree is violative of the purpose of the Board's order in that it fails to make these employees whole. The following is a chart taken from the stipulation entered into by the parties, illustrating graphically the alternative positions urged upon us.[1]

## CLIFFORD A. GALLANT

| I.<br>Net Earnings<br>From 7-26-37 to 6-10-41 | | II.<br>Amount Gallant would Normally<br>Have Earned at Respondent's<br>Plant<br>From 7-26-37 to 6-10-41 | |
| --- | --- | --- | --- |
| A.<br>From 7-26-37 to 3-25-38 | 124.05 | A.<br>From 7-26-37 to 3-25-38 | $1,129.61 |
| B.<br>From 3-27-38 to 3-30-40 | 947.28 | B.<br>From 3-27-38 to 3-30-40 | none |
| C.<br>From 4-1-40 to 6-10-41 | 1,578.19 | C.<br>From 4-1-40 to 6-10-41 | 1,868.85 |
| Total | $2,649.52 | Total | $2,998.46 |

1. Total net earnings of Gallant from July 26, 1937 to June 10, 1941 (total of Column 1, above) — 2,649.52

2. Total amount Gallant would normally have earned from respondent during the period from July 26, 1937 to June 10, 1941 — 2,998.46

3. Less his net earnings during said period — 2,649.52

4. Amount respondent was required to pay Gallant if respondent's position is upheld. — 348.94 (already paid $376.70)

5. Total amount Gallant would normally have earned from respondent during periods A and C noted in Column II, above — 2,998.46

6. Total amount of Gallant's net earnings during periods A and C noted in Column I, above — 1,702.24

7. Amount respondent would be required to pay Gallant if board's position is upheld — $1,296.22 (already paid $376.70)

[1] Stipulations as to earnings of Gallant and Stevens, Exhibits 1 and 2.

## ROY H. STEVENS, JR.

| I. NET EARNINGS From 7-26-37 to 6-10-41 | | II. AMOUNT STEVENS WOULD NORMALLY HAVE EARNED AT RESPONDENT'S PLANT From 7-26-37 to 6-10-41 | |
|---|---|---|---|
| A. From 7-26-37 to 1-28-38 | $155.20 | A. From 7-26-37 to 1-28-38 | 667.65 |
| B. From 1-31-38 to 7-29-39 | 1,199.47 | B. From 1-31-38 to 7-29-39 | none |
| C. From 8-1-39 to 6-10-41 | 3,107.98 | C. From 8-1-39 to 6-10-41 | 2,705.45 |
| Total | $4,462.65 | Total | $3,373.10 |

1. Total net earnings of Stevens from July 26, 1937 to June 10, 1941 (total of Column 1, above) — $4,462.65
2. Total amount Stevens would normally have earned from respondent during the period from July 26, 1937 to June 10, 1941 — 3,373.10
3. Less his net earnings during said period — 4,462.65

4. Amount respondent was required to pay Stevens if respondent's position is upheld. — none
5. Total amount Stevens would normally have earned from respondent during periods A and C noted in Column II, above — 3,373.10
6. Total amount of Stevens' net earnings during periods A and C noted in Column 1, above — 3,263.18

7. Amount respondent would be required to pay Stevens if board's position is upheld — $109.92

This is a civil proceeding rather than a criminal one and our main purpose is to determine the correct amounts due to these employees. Waterman S. S. Co. v. National Labor Relations Board, 5 Cir., 1941, 119 F.2d 760; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 1939, 108 F.2d 188; National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 1939, 104 F.2d 302. As is well stated in Waterman S. S. Co. v. National Labor Relations Board, supra, at page 762 of 119 F.2d: "Punition is not sought so much as clarification as to the principles on which the wage losses should be computed."

The all-pervading purpose of the Board's orders regardless of their difference in language based on different circumstances in each case, is that the employees discriminatorily discharged for labor activities shall not suffer any loss because of their employer's unfair labor practice. See National Labor Relations Board v. Phelps Dodge Corporation, 313 U.S. 177, 197, 198, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. It is clear from the Board's decision that this was its purpose in framing its order in this case. The Board in the matter of Reed & Prince Mfg. Co., 12 N.L.R.B. 944, 977, Footnote 18, in discussing the meaning of net earnings states: "By net earnings is meant earnings less expenses, such as for transportation, room and board incurred by an employee in connection with obtaining work and working elsewhere than for respondent, which would not have been incurred but for his unlawful discharge and consequent necessity of seeking employment elsewhere." We do not believe that the Board intended to frame an order compensating these employees for expenses incurred in seeking employment elsewhere and at the same time allow this respondent to deduct

amounts earned in outside employment during periods they would normally have been unemployed.

It is urged upon us by the respondent that the decree is unambiguous and that the literal interpretation of the Board's order compels us to read the decree in such a manner that the respondent despite its unlawful discharge of these employees, derives benefit from the fact that they were employed elsewhere during the period of respondent's depression. It is argued that the words in our decree "by payments to each of them of a sum or sums equal to that which he would normally have earned as wages from the date of respondent's refusal to reinstate him to the date of such offer of reinstatement less his net earnings during said period" qualifies that part of our decree which states respondent "shall make whole Roy Harold Stevens, Jr., Clifford A. Gallant and Michael C. Sullivan for any loss of pay they might have suffered by reason of respondent's refusal to reinstate them, and that the words "said period" refer to the full four year period in question. While the order might have been framed more clearly, it cannot be said that the respondent will suffer any damage from a proper interpretation of this decree. Respondent has not relied to its detriment upon the interpretation which it presently urges. In a letter written to the Regional Director of the petitioner, as set forth in respondent's answer, it makes the following statement:

" 'We are sending these checks to you so you will know that we have complied with the Decree according to our understanding and you may assure the employees that they may cash the checks without prejudice to any right which you may have to persuade the court that our computation and interpretation of the Decree is incorrect' and further suggested that the respondent join said Director in requesting the Clerk to ask the Court to see the parties 'informally in Chambers to discuss the legal meaning of Section 2(c) of this Decree.' "

The interpretation urged upon us by the respondent under the circumstances of this case is unreasonable. Had there been no discriminatory discharge of these employees and had respondent suffered a depression they would have sought and undoubtedly obtained employment elsewhere. Their total income for the full four year period would have been the sums earned from respondent added to the sums earned in outside employment. If respondent's argument prevails the explicit purpose of the decree is vitiated. These employees suffer loss from their discriminatory discharge unless they receive in the aggregate the same amounts that they would have earned had there been no discharge. If we read the order, realizing its purpose, the only sensible interpretation is the one urged upon us by the Board. A similar interpretation concerning an order exactly phrased as this one was entered in National Labor Relations Board v. J. Greenebaum Tanning Co. decided November 19, 1941 (C.C.A.7th).

We, therefore, order that Reed & Prince Manufacturing Company, Chester T. Reed and Alden Reed forthwith purge themselves of contempt by fully complying with and obeying Section 2(c) of our decree by paying Michael Sullivan, Clifford A. Gallant and Roy Harold Stevens, Jr., the sums due them in conformance with this opinion.

MAGRUDER, Circuit Judge (dissenting in part).

I am constrained to dissent from the court's conclusion as to Michael Sullivan.

In this civil contempt proceeding the Board, as complainant, has the burden of proving upon a preponderance of the evidence that the respondent has failed to comply with our decree. On June 10, 1941, Reed & Prince, in compliance with the decree, offered Sullivan reinstatement to his former position. The only question remaining is whether respondent owes Sullivan anything for back pay; whether it has complied with our command to make Sullivan whole by payment to him of a sum of money equal to that which he would normally have earned as wages from the date of the wrongful discharge, July 26, 1937, to the date of the offer of reinstatement, less his net earnings elsewhere during the applicable period. The amount which Sullivan "would normally have earned" at respondent's plant, absent the discriminatory discharge, necessarily must take into account such factors as seasonal work, shutdown of the plant or reduction of personnel due to adverse business conditions. When respondent in its answer alleges that in the normal course of business Sullivan would have had work at respondent's plant only during a portion of the period from July 26, 1937, to June 10, 1941, it is not, as the Board asserts, setting

up an "affirmative defense" to excuse its non-compliance with our decree. The respondent is in effect denying the Board's allegation of non-compliance with the back pay portion of the decree. Its position is that a computation of what would have been Sullivan's normal earnings at respondent's plant, minus what he earned elsewhere during the applicable period, shows that no back pay is owing to Sullivan under the terms of our decree.

Whether Sullivan in normal course of business would have been laid off during a portion of the period in question depends upon facts peculiarly within the knowledge of respondent. Therefore, though the ultimate burden of proof is upon the Board to establish that respondent has failed to comply with our decree, it is only just that respondent should have the burden of going forward with the evidence, to the extent of making a showing upon which this court, as the trier of the facts, could reasonably find that Sullivan would have been so laid off in the normal course of business. I think the respondent here has sustained that burden.

The evidence before us consists wholly of the stipulation of facts submitted by the parties, with annexed exhibits taken from respondent's records. On this evidence it appears to me altogether probable that Sullivan would have been laid off on or about February 14, 1938, as respondent contends.

There is no doubt that during the latter part of 1937 and the earlier months of 1938 there was a drastic cut in employment at respondent's plant due to business conditions. From a peak employment of 808 at the beginning of 1937 the number of employees dropped to a low of 664 in that year, and this recession continued in 1938 to a low of 256. Sullivan's job on the third shift in department 5 continued in existence without interruption during the whole period in question. Admittedly, however, respondent did not have a policy of "job seniority." Employment in department 5 dropped from 10 men to 6. Layoffs in department 5 appear in fact to have occurred consistently in accordance with the relative seniority of the men working there. Some of these layoffs were occasioned by a shrinkage of employment in the department, others to make room for men of greater seniority transferred from other departments. The five men who worked continuously in department 5 from July 26, 1937, to June 10, 1941, had factory service seniority ranging from 15 years to 24, far greater than that of Sullivan. During the period from February 14, 1938, to January 20, 1941, in which, according to respondent, Sullivan would have been laid off in normal course, there were no men working in department 5 who had less seniority than Sullivan. Two or three men working in department 5, of greater seniority than Sullivan, were laid off after February 14, 1938. The man of next greater seniority to Sullivan, Suchocki, was laid off on February 16, 1938. Cusson, the man in department 5 of next lower seniority to Sullivan, was laid off February 11, 1938. From this, respondent infers that Sullivan would normally have been laid off on or about February 14, 1938.

From the records it is clear that respondent in cutting down its personnel pursued to a considerable extent a policy of interdepartmental transfers, whereby a man of greater seniority in one department would "bump off" a man of less seniority in another. As might be expected this policy was not pursued rigidly and without exception, because not all the jobs in the 38 departments were interchangeable, and in particular cases many other factors necessarily entered in. It is therefore not of great significance that certain men were transferred to department 5, displacing men working there at times when there were still working in other departments men of less seniority than the men thus "bumped off" in department 5. The Board points to the fact that on February 14, 1938, the date on which respondent asserts Sullivan would have been laid off, there were still working in various of the other 37 departments some 44 men with less seniority than Sullivan and earning no greater pay. This number is not surprising, considering the varying requirements and conditions in 38 departments of a plant of this size. In fact, a majority of this group of employees were laid off shortly thereafter, as the recession continued in the early part of 1938. On the other hand, the record contains a list of over 140 employees of greater seniority than Sullivan laid off in all departments during the latter half of 1937 and the first half of 1938; a large proportion of these were laid off prior to February 14, 1938, the asserted date on which Sullivan would have been laid off in regular course. The infer-

ence that Sullivan probably would have been laid off at about this time involves no discrimination against Sullivan.

The question is not whether Sullivan would have been laid off had respondent pursued rigidly and unvaryingly some ideal policy of layoff, say, a policy of treating all 38 departments as a unit and laying off the men in the plant as a whole in strict order of seniority. Rather, the question is whether Sullivan probably would have been laid off in pursuance of the policy, elastic or otherwise, which respondent actually pursued, provided, of course, such policy did not involve discrimination in violation of the National Labor Relations Act.

Under the facts disclosed, there is every reason to infer that Sullivan would not have been retained in department 5 in preference to Suchocki, who had twice the seniority of Sullivan and who was laid off February 16, 1938. Further, considering Suchocki's case, there is no more reason to suppose that Sullivan would then have been transferred to one of the other departments, to displace one of the 44 men of less seniority still employed at that time in other departments.

Respondent fixes the date on which Sullivan would normally have been reemployed in department 5 as business picked up, by reference to the date January 20, 1941, on which the first man with less seniority than Sullivan was hired back in department 5.

Possibly, Sullivan might have been hired back in some other department at an earlier date. In this connection the Board refers to the cases of four men of less seniority than Sullivan, who were laid off in department 5 prior to the assumed date on which Sullivan would have been laid off, and who were reemployed, at lower rates of pay, in other departments. These men were Miller, rehired December 15, 1938, J. Sullivan, rehired October 9, 1939, Vuschilla, rehired November 21, 1939, and Cusson, rehired

December 6, 1939. But if it be assumed that Sullivan would have gotten the job to which Miller was rehired on December 15, 1938, his earnings at respondent's plant during the whole period from July 26, 1937, to June 10, 1941 would have been less than his net earnings elsewhere during the periods he was deprived of employment at respondent's plant by reason of the discriminatory discharge. Hence he would not have been entitled to any back pay under the terms of our decree. The same thing is true if we assume he would have been hired back in one of the other departments in place of J. Sullivan, Vuschilla, or Cusson on the dates above mentioned.

As a further argument for showing that Sullivan would have been rehired at a date earlier than January 20, 1941, the Board points to the fact that as business picked up the respondent hired 266 new men, who had never worked there before, in departments other than No. 5, at rates of pay less than Sullivan had been receiving, and therefore, according to the Board, in jobs which Sullivan presumably would have been qualified to fill. Most of these men were hired on various dates throughout 1940. A few of them were taken on in the last three months of 1939. The earliest of these was Cronican, who was hired as a feeder in department 10 on October 2, 1939 at fifty cents an hour. Here again, if we assume that Sullivan would have been reemployed in Cronican's place on that date, there would have been no back pay due him under the terms of our decree after deducting his admitted net earnings elsewhere during the periods he would have had employment at respondent's plant but for the discriminatory discharge.

Since on the record as I read it no back pay is shown to be due Sullivan, I would conclude that respondent is not in contempt of our decree so far as Sullivan is concerned.