354 F.2d 170
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MASTRO PLASTICS CORPORATION and French American Reeds Manufacturing Company, Inc., Respondents.
MASTRO PLASTICS CORPORATION and French American Reeds Manufacturing Company, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 22.
 Docket 22905.
 Docket 29442.
 United States Court of Appeals Second Circuit.
 Argued October 7, 1965.
 Decided December 9, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED William J. Avrutis, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., on the brief), for National Labor Relations Board.
 Bernard H. Fitzpatrick, New York City (Butler, Fitzpatrick & De Sio, New York City, on the brief), for Mastro Plastics Corp. et al.
 Murphy & Sheehan, Mineola, N. Y., Thomas Sheehan, Mineola, N. Y., of counsel, for Mastro Plastics Corp., Inc. only.
 Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.
 LUMBARD, Chief Judge:
 
 
 1
 The National Labor Relations Board petitions for enforcement of two supplemental back pay orders directing respondents to pay approximately $164,000 to 70 persons who had been discriminatorily discharged by respondents in violation of Sections 8(a) (1), (2) and (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a) (1), (2) and (3). Respondents have filed a cross-petition for review of those orders. The questions here presented are whether the Board's back pay orders were appropriate and, if so, whether those orders can at this time be enforced against Mastro Industries, Inc. (Mastro), the resulting corporation of a merger which dissolved the original respondents after issuance of the Board's first order. We hold that the orders can properly be enforced against Mastro, and we enforce the Board's orders as to every discriminatee except Isiah Smith.
 
 
 2
 On March 13, 1953, the Board issued a decision and order, 103 NLRB 511, declaring that Mastro Plastics Corporation and French American Reeds Manufacturing Co., Inc. (respondents), had discriminatorily discharged 77 employees; the order required, inter alia, that the respondents reinstate the discriminatees with back pay. This court enforced that order, 214 F.2d 462 (1954), and the Supreme Court affirmed. 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1955).[1]
 
 
 3
 The reinstatement question was resolved prior to the institution of back pay proceedings, see 261 F.2d 147 (1958); therefore, the back pay period for each of the discriminatees is indisputably defined. After reinstatement was offered to all, unsuccessful attempts were made to negotiate the back pay question informally, and on June 14, 1960, the Board's Regional Director for the Second Region issued a formal back pay specification and commenced these supplemental proceedings.
 
 
 4
 At the back pay hearing, the Board's General Counsel placed in evidence the back pay specification, which computed the net back pay owing to each discriminatee by subtracting from a gross back pay calculation[2] the net interim earnings of the discriminatee to the extent that such interim information was available. Testimony of each available discriminatee was offered to establish the interim earnings received and his efforts to find alternative work during the back pay period. Respondents cross-examined the discriminatees.
 
 
 5
 At the close of the General Counsel's case, respondents moved to dismiss the proceeding, alleging that the Board had failed to make a prima facie case because it did not present evidence that respondents had jobs available for the discriminatees during the back pay period. The trial examiner denied the motion on the ground that respondents had the burden of introducing evidence in support of this defense. Respondents then declined to offer any evidence in defense, preferring to rest on their claim that the Board's case was legally insufficient. Accordingly, the hearing was closed.
 
 
 6
 The trial examiner's Supplemental Interim Report assessed the testimony of each discriminatee as to whether he had incurred a "willful loss of earnings."[3] The examiner concluded that 62 of the discriminatees were entitled to final back pay awards; he also recommended that the back pay claimed in the Board's specification for eight discriminatees who did not testify be placed in escrow until the eight came forward and appeared at a second supplemental hearing.
 
 
 7
 The Board on review adopted the findings and recommendations of the trial examiner with minor alterations. 136 NLRB 1342 (1942). It reaffirmed its long standing rule that the employer has the burden of proof as to whether a discriminatee incurred a willful loss of earnings and whether the employer would not have had work available for a discriminatee due to factors unrelated to the discriminatory discharge. See, e. g., Brown & Root, Inc., 132 NLRB 486 (1961), enforced, 311 F.2d 447 (8 Cir. 1963); Ohio Pub. Serv. Co., 52 NLRB 725 (1943). The Board took the position that the General Counsel's introduction of the discriminatees' testimony was a "public service" and was not part of his prima facie case.
 
 
 8
 The Board also adopted the trial examiner's recommendation that eight awards be placed in escrow "to afford the Respondent a reasonable opportunity to examine these claimants." Consequently, the trial examiner held a second supplemental hearing in July 1963, and seven of the eight appeared or testified by deposition. The examiner granted final awards to seven of these claimants,[4] including the one who did not testify (Isiah Smith).
 
 
 9
 The Board adopted, again with minor alterations, the trial examiner's second Supplemental Decision. 145 NLRB 1710 (1964). The Board did not discuss further the burden of proof question nor did it specifically discuss the final award to Isiah Smith, which award we do not enforce for reasons explained below.
 
 
 10
 Mastro's challenge to the propriety of the back pay orders raises the following questions: whether the General Counsel's case was legally insufficient because he had the burden of proving job availability; whether the General Counsel had the burden of proving that each discriminatee incurred no willful loss of earnings; and whether the latter burden, if it lies to any extent with the General Counsel, was satisfied.
 
 
 11
 We hold that the Board properly placed on respondents the burden of alleging and proving that jobs were not available for all discriminatees during the back pay period. However, we conclude that the General Counsel had the burden of producing testimony by each available discriminatee that a willful loss of earnings was not incurred. Nevertheless, we find that the burden of persuasion as to willful loss should remain on the employer and, on the facts of this case as disclosed by the discriminatees' testimony, we affirm the award to each discriminatee who testified. Finally, we enforce the back pay orders against Mastro, the successor corporation.
 
 I. The Burden of Proof
 
 12
 Under Section 10(c) of the National Labor Relations Act, as amended, the Board is empowered "to take such affirmative action [against one who has committed an unfair labor practice] including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. The back pay remedy has the twofold purpose of reimbursing employees for actual losses suffered as a result of a discriminatory discharge and of furthering the public interest in deterring such discharges. Because of "the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment," it is settled that the Board must consider, in computing a back pay award, whether the employer would have had work available for the discriminatee had the unfair labor practice not occurred and whether the discriminatee himself has suffered a willful loss of earnings. Phelps Dodge Corp. v. N.L.R.B., 313 U.S. at 198 & n. 7, 61 S.Ct. at 854.
 
 
 13
 However, the Board has long placed the burden of alleging and proving these "affirmative defenses" on the employer, see, e. g., Southern Silk Mills, Inc., 116 NLRB 769 (1956), and this allocation of the burden of proof has been consistently upheld.[5] Under the Board's theory, since the General Counsel sustained his burden of proving an unfair labor practice in the original proceedings against respondents, his only burden in the back pay proceedings was to introduce evidence of the gross back pay due, as calculated in the back pay specification.[6]
 
 
 14
 The main issue in this case, whether the Board must introduce evidence of job availability at respondents' plants, does not involve the ultimate burden of proof, but only the burden of producing evidence; the question is what evidence the General Counsel must adduce to make a prima facie case. Mastro argues that Section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 1006 (c), is dispositive and that the other courts that have considered this question have overlooked this statutory provision. We do not agree.
 
 
 15
 The language of this provision is general: "Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof." It is true that the General Counsel is the "proponent" of the back pay order, but we do not think that Congress intended by this statute to disturb the traditional allocation of the burden of going forward between the parties to an adjudicative proceeding. The legislative comment to Section 7(c) supports our conclusion:
 
 
 16
 "That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain." Sen. Doc. No. 245, 79th Cong., 2d Sess. 208, 270 (1946).
 
 
 17
 Both the N.L.R.A., as amended, and the Rules and Regulations of the N.L.R.B. are silent as to the allocation of the burden of going forward in a back pay proceeding. The regulations are concerned with problems of pleading; they require specific computation of "net back pay due" in the specification and a specific reply to "each and every allegation of the specification" in the employer's answer. 24 C.F.R. §§ 102.53, .54(b). While, in general, the burden of alleging and proving an affirmative defense to action proposed by an administrative agency lies with the party raising the defense, see National Airlines, Inc. v. C.A.B., 112 U.S.App.D.C. 119, 300 F.2d 711 (1962), the question remains what is an "affirmative defense." This last question must be answered by analyzing the purposes behind the back pay proceeding and the practical considerations present in resolving factual issues through administrative adjudication.
 
 
 18
 We agree with the Board's contention that the burden of going forward with evidence of job availability at the employer's plant should be placed on the employer. In the first place, the burden of going forward normally falls on the party having knowledge of the facts involved. See United States v. New York, N. H. & H. R. R. Co., 355 U.S. 253, 156 n. 5, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957); 9 Wigmore, Evidence § 2846, at 275 (3d ed. 1940). To establish that an employer has reduced or adjusted his business to an extent eliminating the job of a discriminatee requires careful analysis of the books and records of the employer during the back pay period. Of course, the Board has access to these records, but it is the employer who kept the records and who therefore is able to explain them and to interpret any ambiguities they may contain. We agree with the cases that have found this factor a persuasive reason for requiring the employer to come forward with proof that jobs were not available. N.L.R.B. v. Reed & Prince Mfg. Co., 130 F.2d 765 (1 Cir. 1942); Underwood Machinery Co., 95 NLRB 1386, 1393 (1951).
 
 
 19
 Moreover, an employer is allowed the defense of job unavailability so that an otherwise appropriate back pay order will not work an undue economic hardship. For this reason, we find it to be an affirmative defense in the traditional sense of that term and a part of the employer-respondents' case.
 
 
 20
 On the other hand, information relevant to whether the discriminatees willfully incurred a loss of earnings is within the knowledge of the discriminatees, not the employer. While the employer must raise this issue of mitigation of damages in its pleadings, it does not follow that the employer should be required to come forward with evidence by producing the discriminatees. Since one purpose of the back pay remedy is to compensate them only for actual losses, it is logically within the duty of the Board to produce at the hearing the evidence most relevant to this question — testimony by the discriminatees. Furthermore, while the Board correctly argues that its primary concern is the public interest in promoting full production and employment by means of the back pay remedy, it is nevertheless the representative of the discriminatees. If the discriminatees had to sue in their own right for back pay, they would obviously have to testify and be cross-examined. Since the Board presumably has some prior contact with available discriminatees when it computes "net back pay due" for its specification, see 24 C.F.R. § 102.53, it is more likely to know their whereabouts at the time of the hearing. We think it fair to require that the Board make them available.
 
 
 21
 The Board has produced the discriminatees for testimony in almost every case where the employer has raised this defense. Indeed, the Board has denied awards to employees when their testimony demonstrated a willful loss of earnings, even if the employer did not produce the discriminatees or offer additional extrinsic evidence on this question. See East Texas Steel Castings Co., 116 NLRB 1336, 1348 (1956); Ozark Hardwood Co., 119 NLRB 1130, 1136-40 (1957); Missouri Transit Co., 125 NLRB 1316 (1959). Because the Board does customarily produce the discriminatees at back pay hearings, we conclude that a rule requiring a discriminatee to testify before his award becomes final is not an undue burden on the Board and would not undermine the efficacy of the back pay remedy.
 
 
 22
 We recognize this decision is contrary to general language in a long series of Board decisions and in a number of decisions from other courts of appeals. See note 5 supra. However, the Board's burden of proof rule was developed in cases where the discriminatees had actually testified and where the question was how to resolve conflicts or insufficiencies in such evidence.[7] These cases are inapposite to the question of whether available discriminatees must appear and testify.
 
 
 23
 It was not until Brown & Root, Inc., 132 NLRB 486 (1961), that the Board stated that the General Counsel performs only an "advisory and cooperative" function when he produces the discriminatees to testify. The Eighth Circuit affirmed this decision in broad language the implications of which are contrary to our decision here, 311 F.2d 447 (1963). The Board relies on that decision in this appeal.
 
 
 24
 But in Brown & Root, all final awards to discriminatees who did not testify were placed in escrow until they appeared so as to afford the employer an opportunity to cross-examine on the willful loss of earnings question. This procedure was used by the trial examiner after the first hearing in this case, and its propriety is not challenged. Indeed, in only one case prior to Brown & Root did the Board bypass the escrow procedure where the impending bankruptcy of the employer justified quick action.[8] Hill Transp. Co., 102 NLRB 1015 (1953). Under these circumstances, we do not think prior decisions of the Board or other courts dispose of the question posed by the award to Isiah Smith.
 
 
 25
 We wish to make clear what we are not deciding when we conclude that the Board should produce the discriminatees to testify. We do not mean that the employer need no longer raise this defense in his answer. Nor do we mean to condemn the Board's practice of requiring payment of the gross back pay figure into escrow when a discriminatee has not appeared initially. The finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer. Therefore, to ensure by use of the escrow technique that funds will be available when a discriminatee is finally located and produced is entirely appropriate. Finally, we recognize that there are instances — death of a discriminatee is the most obvious — when it is not possible to obtain his testimony. See also Hill Transp. Co., supra. Of course, when there is no way of producing a discriminatee, the Board may decide to accept other evidence, such as a deposition.
 
 
 26
 In the instant case, the record reveals that Isiah Smith, the discriminatee who did not appear at either hearing, is now a Florida attorney. No unusual circumstances are shown to justify his failure to appear; the trial examiner made the award to Smith ($1196.33) final on the ground that respondents produced no evidence to show that Smith's interim earnings were other than as set forth in the specification. It is clear that respondents' original answer put in issue the question of Smith's diligent search and his availability for work. Since the best method of resolving these issues was to obtain Smith's testimony, since there is no showing that he was unavailable, and since we conclude that the Board has the burden of producing him, we refuse to enforce this award.
 
 II. Sufficiency of the Evidence
 
 27
 Mastro alleges that the testimony of many of the discriminatees demonstrates a willful loss of earnings for a variety of specific reasons. Because we conclude that the discriminatees were obligated to appear, and because respondents preserved these objections, see N.L.R.A. § 10(e), by raising this defense in their answer and by cross-examining the discriminatees, we cannot, as the Board did, ignore these contentions.
 
 
 28
 Nevertheless, we are unwilling to overturn the long line of cases which place the burden of proof as to these matters on the employer. While orderly adjudication may dictate that the General Counsel produce the witnesses, it is not practical, and it would significantly hamper the back pay remedy, if each discriminatee were required to prove the propriety of his efforts during the entire back pay period. See Lozano Enterprises, 152 NLRB No. 25 (May 5, 1965). As the Supreme Court has said in a different context:
 
 
 29
 "It is true that there was uncertainty as to the extent of the damage; but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). See also Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 560-561, 61 S.Ct. 379, 85 L.Ed. 336 (1941).
 
 
 30
 Since proof of the discriminatory discharges established that some damage had been suffered, it was proper for the Board to leave with Mastro the burden of proving facts to mitigate the extent of those damages. We now turn to Mastro's specific allegations.
 
 
 31
 Mastro argues that the awards to several discriminatees cannot be sustained because their testimony demonstrates that they voluntarily and unjustifiedly quit substantially equivalent employment. While the Board erroneously refused to consider this challenge, the trial examiner made careful findings and determined that in each case the discriminatee was justified in quitting the job in question because, for example, it endangered his health or required him to commute excessive distances. We have carefully examined the record as to each of these discriminatees, and we conclude that the examiner's findings are supported by substantial evidence on the record as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 32
 Several discriminatees secured substantially equivalent employment or became self-employed during the back pay period and yet suffered additional losses thereafter. Mastro argues that the taking of such employment terminates completely its back pay obligation. We do not agree. The only issue here is whether the discriminatee willfully incurred a loss of earnings. It would be unjust to require him to mitigate his damages to the greatest extent possible but then to penalize him for substantial but short-lived success. Unless in taking substantially equivalent or self-employment the discriminatee willfully forewent greater earnings, his back pay should not be reduced beyond the interim earnings he in fact received.
 
 
 33
 Mastro's final challenge is that the awards to two discriminatees who had died before the hearings cannot be enforced because the testimony of relatives which was received to prove diligent search for work was impermissible hearsay. Mastro relies in this contention on Section 10(b) of the Act: "Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States * * *."
 
 
 34
 Even if the testimony here received would be inadmissible hearsay in a civil action, we are not prepared to require the Board to exclude it from a back pay hearing. As the discriminatee could not be produced, the Board could accept other evidence which tended to establish the facts. Here, the evidence was testimony as to the deceased's discussions of his search for alternative work. We do not consider it "practicable," as that word is used in Section 10(b), to exclude this relevant testimony. Moreover, since the burden of proving lack of a diligent search was on Mastro, we fail to see how the admission of this testimony was prejudicial. As we stated above, the Board can only be expected to make available for the employer's cross-examination such evidence as it may reasonably obtain.
 
 III. The Merger Question
 
 35
 On May 18, 1962, after the Board's first back pay order had issued, respondents merged into Mastro Industries, Inc., pursuant to Section 85 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59, (now N.Y. Bus. Corp. Law, McKinney's Consol. Laws, c. 4, § 905). This "short form" merger statute requires that the parent corporation own at least 95% of the merged subsidiary's stock; Mastro has admitted that on May 18, 1962, it wholly owned the two subsidiaries.
 
 
 36
 It is settled that remedial orders of the Board may be enforced against the "successors and assigns" of one who has violated the N.L.R.A. See Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945); N. L. R. B. v. Ozark Hardwood Co., 282 F.2d 1 (8 Cir. 1960). Whether a successor corporation is liable is a question of fact which turns on whether, for example, it is the alter ego of the original respondent or whether it has participated in an attempted evasion of obligations imposed by the Board. See N. L. R. B. v. Deena Artwear, Inc., 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942).
 
 
 37
 Mastro argues that the back pay orders may not be enforced against it at this time because the Board has not held a hearing to determine whether it may properly be held as a successor. While in many cases a hearing may be necessary to determine whether a new owner participated in or had sufficient knowledge of an unfair labor practice to be held responsible, cf. N. L. R. B. v. C. C. C. Associates, Inc., 306 F.2d 534 (2 Cir. 1962), where, as here, the evidence before the reviewing court demonstrates beyond doubt that a successor may and should be held liable for outstanding obligations arising out of orders of the Board, we see no reason to require the Board to hold an additional hearing. As we said in Fay v. Douds, 172 F.2d 720, 725 (2 Cir. 1949):
 
 
 38
 "The Constitution protects procedural regularity, not as an end in itself, but as a means of defending substantive interests. Every summary judgment denies a trial upon issues formally valid. Where, as here, the evidence on one side is unanswerable, and the other side offers nothing to match or qualify it, the denial of a trial invades no constitutional privilege. These considerations are particularly appropriate when we consider that the Board must conduct its duties in a summary way; not, we hasten to add, without observing all the essentials of fair administration, but with as much dispatch as is consistent with those."
 
 
 39
 Mastro may at this time be charged as a successor corporation. Mastro has admitted that it owned both respondents at the time of the merger. Under Section 85 of the Stock Corporation Law, the resulting corporation of such a merger must be "authorized to engage in business similar or incidental to the business" in which the merged corporations engaged; moreover, the resultant succeeds to "all of the estate, property, rights, privileges and franchises of such other corporation * * * subject to all liabilities and obligations of such other corporation and the rights of all creditors thereof." Mastro has not contended on this appeal that the officers of Mastro Industries, Inc., had no knowledge of or played no part in the original unfair labor practice. In fact, Mastro has made no factual arguments that would support its contention that a hearing is necessary. Under these circumstances, there is no need for a further hearing.
 
 
 40
 The circumstances which triggered the discriminatory discharge in this case occurred on November 11, 1950. Reinstatement of most of the discriminatees occurred on March 9, 1956; all the discriminatees had been offered reinstatement by late 1958. Thus, the back pay here awarded has been due for at least seven and in part up to fifteen years. It is regrettable that the enforcement of fairly standard remedies in a case which, except for the original appeal to the Supreme Court, involved no unusual circumstances should be fraught with such delays. Certainly to the discriminatees, a delay of this magnitude must render the back pay award a wholly inadequate and unsatisfactory remedy for their wrongful discharge. Although the Board began awarding interest on back pay awards subsequent to its decision here, see Isis Plumbing & Heating Co., 138 NLRB 716 (1962), even this could not undo the economic hardship caused by many years of undeservedly substandard earnings. Moreover, the substantial delay in enforcing the back pay remedy significantly undermines its usefulness in fulfilling the public policy of promoting full production and employment.
 
 
 41
 This is not a case where the Board has intentionally acted in a manner contrary to its duty[9] to "proceed with reasonable dispatch to conclude any matter presented to it." Compare Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4 Cir. 1961). Rather, the delay has stemmed from the inherently time-consuming nature of the back pay remedy, complicated by a serious and protracted shortage of Board personnel capable of preparing the specification.
 
 
 42
 At the request of this court, the Board's General Counsel has supplied a chronology of these proceedings and an explanatory letter. The letter reveals that the task of obtaining compliance with the Board's original order fell to the Regional Office for the Second Region. During 1956 and the years immediately following, the staff of this office fell to its lowest point in recent years while the number of cases rose to such a volume that the Region was eventually divided into three new regions.
 
 
 43
 The Regional Office made a preliminary estimate of the back pay due the discriminatees while it was processing the reinstatement complaints during the 1956-1958 period. When informal back pay negotiations broke down and a formal specification became necessary, this task proved too great for the Region's personnel and it was referred to the Board's Industrial Analysis Branch in Washington in the spring of 1957. The staff of this branch, however, had been reduced from six analysts to two, and one of these two left the Board shortly thereafter. Thus, the Mastro specification was relegated to the one remaining analyst, who was unable to complete it until early 1960.
 
 
 44
 In addition to the three years required to prepare the specification, other delays caused by the Board's overall case-load[10] are revealed. It took the Board nine months (June 1952-March 1953) to issue its decision adopting the trial examiner's recommendations in the original proceeding. Thirty months elapsed after respondents offered reinstatement to the bulk of the discriminatees before the Board instituted contempt proceedings to have the remaining persons reinstated. And nearly one year elapsed (May 2, 1961-April 24, 1962) before the Board adopted the first supplemental back pay report. To these delays must be added those incident to obtaining appellate review on four different occasions.
 
 
 45
 The activities and jurisdiction of the National Labor Relations Board require efficient resolution of "adjudicative" disputes. The efficacy of the Board's remedies almost always depends upon the extent to which they can return the parties to a status quo ante. Otherwise, collective bargaining cannot be revived on a meaningful and equitable basis and the potential economic costs of unionizing rise to a point where employees are discouraged from that endeavor. Therefore, remedial action must be speedy in order to be effective. We can only hope that those in the executive and legislative branches of our government who are charged with the duty to effectuate the policies of our federal scheme of labor legislation will note the unfortunate and protracted delays which bedeviled these proceedings so that such delays can be avoided in other cases.
 
 
 46
 The Board's petition to enforce its supplemental orders is granted with respect to all discriminatees except Isiah Smith.
 
 
 
 Notes:
 
 
 [1]
 In resolving against respondents a contention based upon § 8(d) of the Act, 29 U.S.C. § 158(d), the Supreme Court commented that there was "sufficient ambiguity" in that section "to permit consideration of relevant legislative history." 350 U.S. at 287, 76 S.Ct. at 360. On this appeal, respondents make the frivolous contention that, because of this ambiguity, it would violate due process to assess back pay for the period prior to the Supreme Court's decision. Even assuming § 8(d) is ambiguous, it is not unconstitutionally vague, and there is no policy against imposing "retroactive" compensatory liability when a violation of a valid statutory duty causes economic injury to persons within the protective scope of that statute. Compare, e.g., Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944) (interpreting the term "workweek" in the Fair Labor Standards Act), a decision which was later abrogated by the Portal-to-Portal Pay Act, 29 U.S.C. § 251 et seq
 
 
 [2]
 Gross back pay owed by respondents was computed in accordance with a formula long employed by the Board in back pay proceedings. Respondents do not challenge the propriety of this formula. Cf. N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953)
 
 
 [3]
 See Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). What constitutes a willful loss of earnings is a concept that has been developed in a large number of cases since the Phelps Dodge decision. It is accepted by the Board and reviewing courts that a discriminatee is not entitled to back pay to the extent that he fails to remain in the labor market, refuses to accept substantially equivalent employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason
 
 
 [4]
 In addition, one discriminatee apparently overlooked at the first hearing also appeared and was granted a final award, bringing the total number of awards to 70
 
 
 [5]
 See N. L. R. B. v. Ellis & Watts Products, Inc., 344 F.2d 67 (6 Cir. 1965); N. L. R. B. v. Biscayne Television Corp., 337 F.2d 267 (5 Cir. 1964); Nabors v. N. L. R. B., 323 F.2d 686, 690 (5 Cir. 1963), cert. denied, 376 U.S. 911, 84 S. Ct. 666, 11 L.Ed.2d 609 (1964); N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447 (8 Cir. 1963); Snow v. N. L. R. B., 308 F.2d 687, 695 (9 Cir. 1962); N. L. R. B. v. Cambria Clay Products Co., 215 F.2d 48, 56 (6 Cir. 1956); N. L. R. B. v. J. G. Boswell Co., 136 F.2d 585, 597 (9 Cir. 1943); N. L. R. B. v. Reed & Prince Mfg. Co., 130 F.2d 765 (1 Cir. 1942)
 
 
 [6]
 We do not stop to consider at this point how the Board can rationalize this argument with the requirement in its Regulations that the specification "specifically and in detail show * * * the net back pay due." 24 C.F.R. § 102.53. See p. 314 infra
 
 
 [7]
 See, e.g., Missouri Transit Co., 125 NL RB 1316, 1331 (1959); Monroe Feed Store, 122 NLRB 1479 (1959); Ozark Hardware Co., 119 NLRB 1130 (1957); East Texas Steel Castings Co., 116 NLRB 1336, 1339 (1956); Southern Silk Mills, Inc., 116 NLRB 769, 770 (1956); Deena Artware, Inc., 112 NLRB 371 (1955): Seamproof, Inc., 103 NLRB 763, 766 (1953); Underwood Machinery Co., 95 NLRB 1386, 1393 (1951); Ohio Pub. Serv. Co., 52 NLRB 725, 729 (1943)
 
 
 [8]
 In cases subsequent to Brown & Root and the Board's decision here, the Board has frequently reiterated that "nonappearance to testify does not disqualify a claimant from entitlement to back pay." Rice Lake Creamery Co., 151 NLRB 105, at p. 36 (March 27, 1965). It seems significant that Rice Lake is apparently the only one of these cases where a final award out of escrow was granted to a discriminatee who did not testify. And, in that case, the employer had served the discriminatee with a subpoena but had failed to pursue him further despite the urgings of the trial examiner. While we disapprove of requiring the employer to produce the discriminatee, in that case the employer seems to have abandoned his defense
 
 
 [9]
 See Administrative Procedure Act § 6(a), 5 U.S.C. § 1005(a)
 
 
 [10]
 The Board's case-load increased phenomenally during the years in question. The total number of cases filed increased steadily from 13,356 in fiscal year 1957 to 27,403 in fiscal 1964. The number of unfair labor practice cases filed rose from 5,506 to 15,620 during the same period, while the number of cases pending at the end of the fiscal year rose from 4,416 to 8,085. (Figures taken from the Annual Reports of the National Labor Relations Board.)